CITY NATIONAL BANK *v.* WOFFORD.

4-3707

Opinion delivered November 5, 1934.

*W. L. Curtis* and *James B. McDonough,* for petitioners.

*Hill, Fitzhugh & Brizzolara,* for respondent.

BUTLER, J. Mrs. J. A. McCann and D. H. Moores filed suit against the City National Bank of Fort Smith and I. H. Nakdimen. There were separate suits, but the cases are similar, the allegations of the two complaints being practically identical except in two particulars, which will be later noticed. The allegations in brief were to the effect that plaintiffs were customers of the bank which had, from time to time, been investing the surplus of the complainants in securities selected by it and its president, Nakdimen. They were not advised of the value of these securities, but relied solely on the advice of the president of the bank in making investments. In all instances the president represented that the securities purchased for them were ''gilt edged'' and ''as good as gold''; that is to say, that the character of the investments was safe and conservative.

Pursuant to such course of dealings, the complainants purchased from the bank through its president certain bonds of the East Oklahoma Publishing Company, paying par and accrued interest, Mrs. McCann purchasing bonds of the first issue of $75,000, and Moores buying bonds of a second $50,000 issue. For a time the interest was collected by the bank and deposited to their account,

and long after the purchase of the securities they were informed of certain facts which made them doubt the value of the securities, and, on learning that bankruptcy proceedings had been instituted against the publishing company, they made investigation as to the solvency of said company and market value of the bonds. They charged that the president of the bank had promoted the incorporation of the publishing company; that he had purchased several newspaper plants in Oklahoma for $69,000, formed the said publishing company, capitalized it at $90,000 of which $45,000 was issued to him, and nothing was paid by him and the corporators therefor; that said newspaper plants constituted the sole assets of the corporation, and that immediately after its formation it issued $75,000 of bonds secured by mortgage upon said plants made to the Sallisaw State Bank of Oklahoma of which Nakdimen was president. The bonds involved in Mrs. McCann's suit were a part of said bond issue.

The Oklahoma Constitution prohibits the issue of stock except for money, labor done, or property actually received, and the statutes of that State render stockholders liable for the debts of a corporation to the extent of the amount unpaid on said stock.

The bonds provided that no recourse should be had for the payment of the principal or interest thereon against past, present or future stockholders, directors or officers of the company by virtue of the statutes and Constitution of Oklahoma, or by the enforcement of any penalty or assessment or otherwise. The mortgage securing said bonds has many exculpatory provisions which materially impair the rights of the holders of the bonds, and gives undue privilege and unreasonable immunities to the trustee. Plaintiffs were not familiar with the force and effect of the provisions in the bonds and mortgage, and, if they had read the same, they would have conveyed no definite meaning to their minds as to the effect upon their securities.

It was alleged by plaintiff McCann that the transaction by which she was induced to, and did, purchase the bonds was fraudulent in that the defendants failed

to inform her that the $75,000 issue was made by a company owning property not exceeding $69,000 in value secured by mortgage on property not exceeding $65,000 in value, ostensibly by a corporation whose capital stock amounted to $90,000 when it had no capital paid in; further, in failing to advise plaintiffs of the clause relieving the stockholders of liability, which had the effect, together with the other circumstances relating to the securities, of rendering the investment a poor one, and not of the character represented by defendants to the plaintiffs that they were making with their money. This entitled the plaintiffs to a rescission and a return of the money invested.

In the Moores complaint the additional allegation was made that a year after the company had issued the $75,000 bond issue it bought three certain newspaper plants at a price far below $50,000, and that the price paid was not in excess of the market value of same; that on October 1, 1929, the publishing company issued $50,000 in bonds purporting to be "first mortgage serial bonds," and these were secured by a deed of trust similar to the one securing the first bond issue, the same bank being named as trustee; that the defendant bank purchased for him $9,000 of these bonds. The property securing this issue was three plants acquired after the first bond issue, and all property included in the deed of trust securing that issue. The mortgage contained covenants that the mortgagor owned the absolute title, free and clear of all incumbrances, liens or charges, and that it was, and would be, kept a first lien upon the trust estate.

That the bonds purporting to be thus secured were not in fact as covenanted, but were only a first mortgage on three plants, and a second mortgage on the remainder of the plants—that is, there were nine plants described in the deed of trust which the mortgage warranted was a first lien on all, but which in fact was only a first lien on three.

That the recitals of the bonds and mortgage were false in so far as they stated that they were first liens on the property; that these were known to be false by defendants when they sold the second bond issue.

Included in Mrs. McCann's complaint was the allegation that the bank and its president, Nakdimen, purchased two notes for her, executed by W. L. Sharp, which were represented to be a good investment, and secured by a first mortgage on valuable property, whereas, in fact, the security was never adequate; that said notes were due November 1, 1928, a year after the purchase by her, but the principal has not yet been paid and interest only until October 1, 1932; that the total bond issue on the Sharp transaction was $10,000; that $1,000 has been paid on the principal, no part of which has been paid to her, and that she is entitled to her *pro rata* share thereof. She alleged that the notes were not such an investment as represented, and that she is entitled, under the agreement between her and the bank, to a repurchase by it of said notes, which she tendered with her complaint.

Based on the allegations of these complaints, the plaintiffs joined in a petition for the production of books, papers and documents of the bank and Nakdimen relating to the transactions involved in the complaints. In the petition it was alleged that all of the transactions and matters relating thereto are contained in the books, papers and documents of the bank and Nakdimen, and that the plaintiffs are entitled to an examination and inspection of them in advance of trial so that they may properly present the facts found therein to the court; that an accountant should be appointed to examine and inspect the books and documents, and to ascertain the facts "hereinafter called for, whichever may seem to the court the best method of ascertaining the facts." It was alleged that the matters sought to be inquired into were material to the plaintiffs' causes of action and the defenses interposed herein by the answers. (The answers filed by the bank and Nakdimen contained specific denials of each and all the allegations of the complaints.)

First. It was alleged in the petition that an examination of the books of Nakdimen for a short period prior to October 1, 1928, will disclose the truth or falsity of the allegations respecting the purchase price paid by Nakdimen for the publishing plants, and it was prayed

that the court order him to submit his books and papers relating to the purchase of said plants for examination by an accountant with directions to the accountant to ascertain what amount was paid for said plants, to whom paid, and when.

Second. That defendant bank's books be examined to ascertain whether the sum paid by Nakdimen for the publishing plant passed through said bank, and, if so, that a full account of the transactions shown on its books be ascertained and reported by the accountant.

Third. That it is material to the issues to ascertain the truth or falsity of the allegations in the pleadings relating to the purchase and amount of the bonds involved, and that plaintiffs, through their accountant, examine the books and papers of the defendants with respect to these allegations and ascertain the facts relating to the sale of said bonds, and, if sold to the plaintiffs, whether or not handled individually by Nakdimen. Whether the bank or Nakdimen owned the bonds sold to the plaintiffs, or any part of said bond issue at the time of their sale, and that it should be ascertained from said books to whom the proceeds of the bonds sold to plaintiffs and other bondholders were paid, and what commission, if any, was charged the East Oklahoma Publishing Company for the sale of the bonds to these plaintiffs and other bondholders.

Fourth. That it is material to the issues to ascertain if the bank acquired the bonds sold to plaintiffs or other bonds of which plaintiffs' bonds, respectively, were a part, and, if it did not acquire said bonds, in whose behalf it was acting in making the sale.

Fifth. That the account between the defendant bank and East Oklahoma Publishing Company is material so far as the same may show that the bank was lending money to said Publishing Company and receiving payment from the sale of said bonds for money owing by the company to it, and, if the books of the bank failed to disclose these facts, then the books of Nakdimen should be examined.

Sixth. That the request made was an examination of the books of defendants relative to the account between

Nakdimen and the Publishing Company, in so far as it relates to the amount paid for the purchase price of the plants which he sold to the Publishing Company, and how, and from what source, the Publishing Company derived the money it paid him for said purchase price when the same was received by him; and, if it was from the proceeds of the bond issues described in the complaint, with a full statement of the transactions between him and said company in regard to said bond issues to be made by the accountant which should include any assessment paid upon his stock, if any, and dividends received therefrom, if any.

Seventh. The request was made for a full statement by the accountant of the account between the bank and the Publishing Company from the date of its organization to the present, showing the amount of indebtedness owed the bank by said company, what payments were made to it and what indebtedness, if any, the company now owes the bank and what securities the bank holds for said indebtedness.

Eighth. In relation to an allegation in the complaint of plaintiff McCann regarding the sale of notes of W. L. Sharp "which were in the main denied in the answer," request was made that it be ascertained by the accountant from the books of the bank or Nakdimen, which was the seller of the notes to plaintiff, the total amount of the mortgage indebtedness against the lands mortgaged to secure said notes, who owns the other notes secured by the said mortgage, the amount paid by plaintiff for the notes purchased by her, what disposition was made of the money paid for the purchase price, and what amount, if any, Sharp owed the bank prior to the sale of the notes to plaintiff and others; and a full statement of an account between Sharp and the bank and the disposition made by the bank of the proceeds of the notes which were sold to plaintiff McCann and others.

Ninth. In the case of D. H. Moores, it was alleged that as a part of its business the bank was engaged in selling securities to its customers and the public, receiving a commission and in many instances being benefited by such sales. It was stated that the truth of the allega-

tions which were denied by the answer be ascertained and request was made that the accountant be directed to ascertain these facts from an examination of the books of the bank.

Tenth. That it be ascertained from an inspection of the account between the Sallisaw State Bank (the trustee in the deed of trust to secure the bond issues of the East Oklahoma Publishing Company) and City National Bank what bonds, either of the first or second issue of the East Oklahoma Publishing Company, were handled or sold on commission or otherwise by the City National Bank for account of Sallisaw State Bank.

Over the objections and exceptions of the defendants, the court granted the petition for the production of the books, papers and documents as prayed except as to the ninth paragraph and endeavored to limit the scope and effect of its order by certain preliminary directions providing ''that the accountant shall only examine so much of the books, papers and documents as necessary to obtain the information required, and may transcribe so much thereof as necessary or make memoranda or a summary thereof, and shall not transcribe, copy, or make memoranda or summary of any other matters than those specifically called for in the nine paragraphs hereinafter set out.'' The accountant was further ordered, if, in his examination of the books, papers and documents, he should discover matters not related to, or mentioned in, the matters herein inquired of, he shall not disclose such matters to the plaintiffs, their counsel or any other person, and that a violation of this direction should be a contempt of court.

The order further provided that the examination called for should be made by the accountant in the bank at reasonable hours to suit the convenience of its officers and should be made in the presence of a representative of the bank and that a like procedure should be pursued in the examination of the books of the defendant Nakdimen, this examination to be either at his office in the bank or at any place most convenient to him with the right for him to be present in person or by a representative during the examination. It provided further that if

the bank or Nakdimen should refuse access to any of the books, etc., which the accountant should consider material in his investigation, he should at once report said fact fully to the court.

The defendants brought this action against the chancellor praying for a writ of prohibition seeking to prevent the enforcement of the aforesaid order.

The majority of the court is of the opinion that this is a proper case for the writ prayed, because the trial court has exceeded its authority and there is no other remedy which will afford defendants protection against the wrong. As interpreted, the petition and the order of the court based thereon would subject the defendants and their affairs to an unwarrantable intrusion and investigation and affect not only the rights of the defendants themselves, but of many persons doing business with the defendant bank which the bank is entitled to have protected. It is thought that, from the very nature of the investigation sought, many matters would come under the observation of the accountant wholly unconnected with the matters in dispute in this case, and that, while the trial court has endeavored to limit the scope of the inquiry by the accountant and prescribes penalties for his failure to observe the directions of the court, these precautions are wholly inadequate if the accountant is minded to observe irrelevant matters and convey the information thus obtained to others. It is obvious that this could be done by the accountant in such subtle fashion that no proof could be made of his disobedience of the orders of the court, and at most but a well-grounded suspicion attach.

The view is taken that the petition fails to make a substantial showing that the books sought to be examined contain material evidence supporting the allegations of the complaint. No particular books are pointed out, but the petition asks and the court permits the accountant selected to range at will among the books and papers of the defendants to discover, if he can, evidence which plaintiffs suspect is contained in some book or books to support the allegations of their complaint. The opinion is that the effect of the court's order would, and does,

authorize a "fishing examination" and offends against the rule that the materiality of the books and papers is not a question to be decided by the applicant but rather by the court.

The rule against which the order is deemed to offend is cited by the defendants and is found at page 1092, 10 R. C. L., as follows: "But a party to a pending action has no right to call for books, papers and documents as to his adversary merely for the purpose of entering into a 'fishing examination' of them. To authorize their production there must be a substantial showing that the book, paper or document sought for contains material evidence in support of the cause of action or defense of the party asking for it. A mere suspicion that it contains such evidence does not warrant an order for its production. The enactments upon the subject generally make it a condition that the books, etc., required shall contain evidence relating to the merits of the case."

Section 1393 of Elliott on Evidence provides: "The fundamental requirement as to the sufficiency of the motion or petition is that it must be shown upon good and sufficient cause that the books, papers or documents sought to be produced or inspected contain evidence material and pertinent to the issues and on behalf of the applicant. * * * It is not sufficient to allege generally the materiality of the books or documents, as this would not only be the averment of a conclusion, but would permit the question of materiality to be decided by the applicant instead of by the court. Hence it is not sufficient to allege that such books or papers contain evidence relative to the merits of the action, but it must be made to appear wherein such relation consists. In other words, the rule, as stated by the court is: 'It is well settled that an order for discovery and inspection will never be granted unless the necessity therefor is clearly shown.' "

And § 1396 of the same authority provides: "Another essential requirement of the motion or petition is that it shall definitely and sufficiently designate or describe the books, papers or documents required. A general reference is not sufficient; both the petition and the

order should specify, with reasonable certainty, the book or paper which is to be produced."

The view is taken by the majority that, if the petition was otherwise unobjectionable, it is premature. Plaintiffs should first endeavor to establish the allegations of their complaints by the testimony of witnesses and by an examination, by deposition or otherwise, of the defendant Nakdimen and the officers of the defendant bank, thereby laying a foundation for the request for the production and examination of the books. The rule stated in § 1410, Elliott on Evidence, is: "If the discovery is plainly attainable by competent and available testimony other than that of the party, a production of books should not be allowed without special circumstances. If it is attainable by an examination of the party as a witness, it should also be refused except upon special ground."

It follows from the views expressed—which are those of the majority and not of the writer, and with which he does not agree, that the writ should be granted, and it is so ordered.